MARVIN et al. v. FIRST NAT. BANK OF AURORA, ILL., et al.

No. 13287.

District Court, N. D. Illinois, E. D.

March 8, 1935.

Fred B. Shearer, of Aurora, Ill., for plaintiffs.

Mighell, Gunsul, Allen & Latham, of Aurora, Ill., for defendants.

LINDLEY, District Judge.

Plaintiffs bring this suit against the receiver of the First National Bank of Aurora, seeking to have established their claims as beneficiaries of a trust and to have the same paid out of the trust fund held by the receiver for the benefit of such beneficiaries. This fund was originally in the hands of the state auditor of Illinois and consisted of $50,000 in liberty bonds deposited by the bank, in order to comply with the statute of Illinois, upon its application to be authorized to conduct a trust department. In equity cause No. 13611 in this court the receiver filed his petition, setting up that such bonds were held by the auditor for the protection of the bank's trust creditors, and that the total trust liabilities did not exceed $40,000, included in his application a recital that a trust in favor of plaintiffs in this suit was among the protected debts, and prayed that the auditor should be directed to surrender the bonds to the receiver to be applied by him in discharge of the said trust liabilities. In the resulting order, the court found a trust in favor of the plaintiffs to be one of the trust estates protected by the fund, and that the total trust liabilities against said fund did not exceed $40,000, and directed the auditor to surrender the bonds to the receiver and the latter to hold same or the proceeds of sale thereof segregated from the general assets of the bank in trust for the creditors of the trust department. Plaintiffs accordingly brought this suit seeking a decree that they are entitled to recover the amount due them under the terms of their

alleged trust, and to have same satisfied from the said securities.

The bank, in the year 1920, procured a certificate from the Federal Reserve Bank in pursuance of the Federal Reserve Act (44 U. S. Stat. pt. 1, p. 276, 12 USCA § 248 par. (k), which permits national banks to act as trustees where state banks might so act, the said certificate reciting that the operation of the trust department should be in accordance with the regulations of the Federal Reserve Board promulgated in pursuance of the act. These regulations provide that a trust officer shall be selected and certain duties performed in the administration of all trusts. Following the receipt of this certificate, the bank received authority on May 22, 1920, from the auditor of the state of Illinois to act as trustee.

Some three years later, February 1, 1923, the bank entered into a formal trust agreement with the plaintiffs. In this the bank was named as trustee. It recited that the res of the trust consisted of four of five $5,000 notes executed by John K. Newhall and Albert Snook, secured by trust deed executed likewise in favor of the bank as trustee.

The trust agreement was signed by plaintiffs and by the bank by Frank B. Watson, its president. It bore the seal of the bank and was attested by John M. Raymond, as secretary of the bank. The other $5,000 note was owned by Cleora Marvin. The trust agreement recited that plaintiffs Marvin and Fishburn desired to create a trust in order to make provision for the payment to their mother, Stolp, of the net income growing out of the four notes in question; that they deposited the notes with the bank as trustee; that the bank would collect and pay to said Stolp the net income derived from said securities, after deduction of taxes and a commission of 5 per cent., during the life-time of the mother or until the trust should be revoked as provided in the agreement. The res of the trust, after the payments to the mother, was at all times the property of plaintiffs. At that time the bank had no designated trust officer, although the federal regulations required such, and formally named no such officer until 1927. Frank Watson was president of the bank, and, as such, was the chief administrative and executive officer. He was active in the bank, being present daily, devoting his entire time to the administration of its affairs, for a salary of $7,200 per year.

It appears that no entry of the trust was made upon the books of the bank, but account was kept of the interest collected from the makers of the note, which was paid regularly to the beneficiaries under the trust agreement. None of the beneficiaries lived in Aurora. To them remittances were duly mailed, accompanied by letters, signed by Watson, as president, or by the cashier or assistant cashier.

On January 25, 1928, all five of the notes were paid, and the payor issued a check to "First National Bank, Trustee, Aurora, Illinois," drawn on the Northern Trust Company of Chicago, in the sum of $25,750, being the full amount of the principal and interest due on the notes at the date of maturity, February 1, 1928. The check was indorsed "First National Bank, Trustee, Aurora, Illinois, by F. B. Watson, President" and then by the bank to the Union Trust Company of Chicago, and remitted to the latter, wherein it was deposited on January 26, 1928, to the credit of the First National Bank of Aurora, becoming a part of the total deposit that bank then had with the Union Trust Company in its general account of upwards of $230,000. Thus the entire res of the estate was paid to the bank as trustee and by the bank deposited to its own credit in the Union Trust Company of Chicago. In the absence of any avoiding facts, it is obvious, on this record, that when the bank, as trustee, received cash representing the res of the estate and deposited the entire amount to its own credit, it thereby converted the trust fund to its own use as a bank, and nothing it did thereafter in the way of disposition of that fund would discharge its liability for conversion as trustee, except the performance of its trust obligations as set out in the trust agreement, that is, an accounting with the beneficiaries of the trust. Thus, in Central R. & Banking Co. v. Farmers' Loan & Trust Co., 114 F. 263, 265 (C. C. A. 5), the court said:

"It is immaterial whether there be force or not in appellants' contention that the Central Railroad & Banking Company of Georgia had no power to make itself the trustee of the sinking fund. It is evident that, that corporation having received the fund, a court of equity will not allow it to be withheld to the detriment of those to whom it belongs or who have claims upon it."

See discussion in 4 Thompson on Corporations (3d Ed.) § 2893.

■ It does not appear how, when, or whether this deposit with the Union Trust Company was withdrawn by the First National Bank of Aurora. It is shown that, beginning substantially contemporaneously with this transaction, the president of the bank, with the aid of some of the employees of the bank, in the course of a few months, disbursed in favor of certain depositors of the bank and to Watson an amount aggregating the total amount of the trust fund. Obviously, under the law, these acts by a trustee can have no effect in the way of a discharge of its liability for conversion of the trust fund unless the beneficiaries are, in some way, barred by their acts.

The bank did not advise plaintiffs of the fact or of the manner of collection of the trust fund, but continued to forward interest to the beneficiaries. On February 4, 1930, Watson suggested that Stolp retire a $600 note she owed the bank out of the corpus of the trust estate, and Mrs. Marvin answered that such suggestion was unsatisfactory, as it would create a new res of $19,400. This letter clearly indicated that plaintiffs believed the trust intact and so treated it.

On February 23, 1932, plaintiffs, having had a visitor from Aurora, became apprehensive of the condition of their trust and demanded an explanation. Watson then wrote on March 1, 1932, inclosing an interest check, and stated that the security for the trust was his note secured by life insurance. Mrs. Marvin immediately replied that what he stated left her only in greater doubt, that the trust agreement was with the First National Bank of Aurora, and that she did not see how he could be administering it personally. Some other letters crossed, but the court finds nothing in this correspondence that indicates in any way that the plaintiffs at any time assented to a conversion of the trust fund, or to any alteration of its character, or to anything other than their right to protection under the trust agreement with the bank. It is argued that they were negligent; that they should have known that the notes were collected and that they are legally charged with notice that there had been a change in the form of the corpus of the estate. But I find no evidence whatsoever in support of any contention that they have been negligent or guilty of laches, or that they have done anything or failed to do anything that would create an estoppel against them from asserting their claim, if they had one.

■ The defendants deny that the bank entered into a trust agreement, or that the president had any authority to execute the trust agreement; asserts that the bank was without authority to execute trusts, and apparently contends that because there was no entry upon the bank's books, and because the bank did not comply with the federal regulations in its administration of trust estates, it was never bound. The receiver of the bank and the First National Bank in Aurora, which we will call the "new bank," which took over the assets of the First National Bank of Aurora, the "old bank," filed an intervening petition in which the new bank claims that it has purchased the bonds in question from the old bank and has title superior to that of the plaintiffs therein.

The situation, as the court sees it, is exactly the same as if the bank were a trust company authorized to do business. The certificate of the federal authorities, followed by that of the state authorities, had the effect of adding capacity to act as trustee to the charter powers of the bank, so that thereafter its corporate powers, instead of being only those of a national bank, as originally included in its charter, were increased to include the performance of the duties of trustees under the laws of Illinois. Statutory limitation upon corporate power, of course, we must always observe, but regulations, by-laws and resolutions may or may not be such that third persons must take notice thereof, depending upon the circumstances. Thus, it is quite commonly said that the usual and implied powers of an officer dealing with the public cannot be impeached by the by-laws of the corporation which he represents. In Green v. Ashland State Bank, 346 Ill. 174, 178 N. E. 468, 471, the Supreme Court of Illinois said:

"The public is not bound to inquire into the special instructions which the officers or servants of a bank may have received as to the manner in which they shall discharge their duties. This is a matter solely between the employer and the employed. The general rule is that the by-laws of a corporation are binding upon none but its members and officers."

In the earlier case of Ward v. Johnson, 95 Ill. 215, 248, the court said:

"We do not regard the by-law directing the investment of savings deposits otherwise than as binding upon the officers and members of the banking corporation alone. The general rule is, that the by-laws of a

corporation are binding upon none but its members and officers. Angell & Ames on Corp. § 359.

"We do not think, in any view, the proof shows that these certificate holders had such knowledge of the by-laws of this corporation as to be bound and concluded by them. They were, practically, strangers to the corporation, and could not hence be affected by any disobedience of its officers or directors to its by-laws, of whose contents they were ignorant. Their good faith is unquestioned by the proof, and they are entitled to the protection given them by the decree of the Appellate Court."

See, also, Munn v. Burch, 25 Ill. 21; Quigley v. W. N. Macqueen & Co., 321 Ill. 124, 151 N. E. 487.

In the absence of any corporate grant of specific authority to the president to act as trust officer, we have this situation: He is the chief executive authority of a bank which has been authorized by statute to act as trustee. Concerning the powers of the president of a corporation, the Supreme Court of Pennsylvania said in Baltimore & P. Steamboat Co. v. McCutcheon, 13 Pa. 13, 15:

"Who, then, was the proper person to make the contract? Certainly, the president. We must bear in mind, that these kind of artificial men or persons are becoming very common in this state; the legislature turns them out, almost as rapidly as a miller does his grist. They compose a new element or ingredient of modern society; they contract with everybody, and about all manner of things; and they can contract by their chief officers; and such is their usual course of business. The president of a company presents himself to make a contract, evidently connected with the business; he declares the object and purpose of the contract. Who doubts him? We are a dealing people. Is he asked to produce the charter and the books of the company, to show that he is authorized to make the contract secundum artem? Such is not the custom."

The Missouri Court said in Sparks v. Dispatch Transfer Co., 104 Mo. 531, 15 S. W. 417, 419, 12 L. R. A. 714, 24 Am. St. Rep. 351:

"The president of a business corporation is its chief executive officer. He may, without any special authority from the board of directors, perform all acts of an ordinary nature, which by usage or necessity are incident to his office, and may bind the corporation by contracts in matters arising in the usual course of business."

The Illinois Court, in Chicago, etc., R. Co. v. Coleman, 18 Ill. 297, 68 Am. Dec. 544 said that the president is treated by the public, and made by usage, the chief officer and executive head of the corporation. Through him numerous everyday affairs of the corporation are transacted; and such acts as are incident to the execution of the trust reposed in him, of an ordinary character arising in the routine of business, such as custom or necessity has imposed upon the office, he may perform for the corporation without special or express authority. See, also, Cozzens, etc., Typesetting Co. v. Western Ranch, etc., Co., 112 Ill. App. 309; Chicago, etc., R. Co. v. Board of Sup'rs of Boone County, 44 Ill. 240; Jones, etc., Co. v. Crary, 234 Ill. 26, 84 N. E. 651.

Here Watson was president of a company authorized to conduct a trust business. As such chief executive, he has entered into an agreement, promoting its trust business, attested to by the secretary, to which the corporate seal is attached; creating a trust relationship. It is the same as though he were the chief executive officer of a trust company.

In Green v. Ashland State Bank, supra, we find peculiarly pertinent language:

"E. A. Curtis was known by Russel and petitioner to be the president of respondent. He held himself out to them as authorized to sign the contract on behalf of respondent. * * * Acceptance of the deposit with full knowledge of the conditions attached thereto, the conversion of the bonds, and failure to return them on demand, estop respondent from claiming that the contract made by its president was without authority."

It is old law that a corporation which receives the benefit of the contract may not set up as against recovery the doctrine of ultra vires, whether that term be used in its strict legal sense or in the sense of covering acts not forbidden by law, performed by an unauthorized representative. It is asserted herein, however, that the bank received no benefit. The facts do not bear out this contention. This bank, whose chief executive officer acted as such for eight consecutive years, collected the res of the estate by a check payable to it as trustee. This entire res it deposited to the credit of itself, as a banking institution, in another bank. It thus received benefit to the extent of $20,000, all of which went to

its credit. Nothing that that bank did after depositing this wrongfully obtained res could thereafter relieve it of the performance of its trust duties. It converted the res into a credit of its own, and it may have thereafter given away this corpus to its friends, customers, and employees or otherwise dissipated it, but it received a benefit of $20,000, and whether in the end it utilized that benefit for a resulting gain to it is of no importance. Thus, in National Home Bldg. Ass'n v. Home Savings Bank, 181 Ill. 35, 54 N. E. 619, 621, 64 L. R. A. 399, 72 Am. St. Rep. 245, the court said:

"It is also argued that the building and loan association is estopped to raise the question whether the contract was ultra vires, because it has received the benefit of the contract, by the conveyance of property to it. That depends, as we think, upon the sense in which the term 'ultra vires' is used. It has been applied indiscriminately to different states of fact in such a way as to cause considerable confusion. * * * For example, the term has been applied to acts of directors or officers which are outside and beyond the scope of their authority, and therefore are invasions of the rights of stockholders, but which are within the powers of the corporation. In such a case the act may become binding by ratification, consent, and acquiescence, or by the corporation receiving the benefit of the contract. Again, it has been applied to cases where an act was within the authority of the corporation for some purposes or under some circumstances, and where one dealing in good faith with the corporation had a right to assume the existence of the conditions which would authorize the act. Where an act is not ultra vires for want of power in the corporation, but for want of power in the agent or officer, or because of the disregard of formalities which the law requires to be observed, or is an improper use of one of the enumerated powers, it may be valid as to third persons."

In Ward v. Johnson, 95 Ill. 215, 240, the following language is pertinent:

"The proof shows that the money for which the certificates of investment were issued went into the general business of the bank, and was used for paying everything for which the bank used money.

"The contract, therefore, having been in good faith performed by the certificate holders, and the bank having had the full benefit of the contract, it is not allowed to interpose the defence of ultra vires."

But it is said that plaintiffs cannot seek payment out of the bonds deposited with the state auditor or proceeds therefrom. In the case of In re National Bank of Ottawa, 273 Ill. App. 545, 555, the court held otherwise. There the court said:

"That this $28,420 was a trust fund and was so regarded by all the parties, including the bank, cannot be doubted. * * * Having determined that it was a trust fund, the next inquiry is to determine whether it is protected by the bonds which the bank had deposited with the auditor of public accounts.

"Under the laws of this State, it would have been unlawful for the National City Bank to accept this trust without procuring from the auditor of public accounts a certificate of authority stating that it had complied with the requirements of the Trust Company Act, Cahill's Ill. Rev. St. 1933, c. 32, par. 345 et seq. [Smith-Hurd Ann. St. c. 32, § 287 et seq.]. This certificate of authority is obtained by depositing with the auditor $50,000 in bonds or mortgages upon real estate as in the act provided. The National City Bank complied with this statute, deposited bonds of the sanitary district of Chicago as required, and received its certificate of authority. The statute provides that these bonds should be registered in the name of the auditor officially and held by him for the benefit of the creditors of the bank. In our opinion defendants in error are creditors of this bank within the meaning of this act, and are entitled to have their trust claim, along with all other trust claims so protected, satisfied out of the proceeds of these sanitary district bonds so held by the auditor."

The language seems to the court directly applicable to the situation confronting us. See, also, Knott v. Morris, 101 Fla. 1299, 134 So. 615; Wasson Bond & Mortgage Co. v. Therrell, 113 Fla. 140, 151 So. 497; Donnelly v. Slaughter, 114 N. J. Eq. 302, 168 A. 762, 763, affirmed 116 N. J. Eq. 542, 174 A. 507. In the last-mentioned case the court said:

"The question before me is: Did the bank accept the executorship? If it did, the mere fact that, after acceptance, it never actually changed the saving fund account of decedent to an account by some other name, is of no consequence. That was merely a matter of bookkeeping, and the question here is not the label given the account, but whether or not the deposit, no

matter what its label, was held by the bank in the capacity of executor.

"* * * If the bank did receive the assets of the estate in the capacity of executor and did accept the executorship, and I find as a fact that it did, they were trust funds, and under the Federal Reserve Act the complainant has a lien on the trust funds set apart by the bank as security therefor."

In construing a state statute similar to that of the state of Illinois, the United States District Court, in United States v. People's Trust Co. et al., 17 F.(2d) 437, 440, said:

"[1] The plaintiff claims that under the provisions of P. L. c. 268, § 29, to which reference is made above, that upon liquidation no distinction can be made between the debts of the commercial department and those of the savings department. I cannot agree with counsel. * * * I hold that the assets of the savings department are impressed with a trust for the benefit of depositors in that department, and cannot be used to satisfy debts of the mercantile department."

In Morrison v. Lawrence Trust Co., 283 Mass. 236, 186 N. E. 54, 55, the court said:

"The failure of the company or its officers and agents to enter and treat the deposit as a trust fund cannot deprive the plaintiff of her right to recover the full amount thereof with interest. Commissioner of Banks v. Cosmopolitan Trust Co., 240 Mass. 254, 133 N. E. 630; Wasserman v. Cosmopolitan Trust Co., 252 Mass. 253, 147 N. E. 742; Cronan v. Commissioner of Banks, 254 Mass. 444, 450, 150 N. E. 193. The plaintiff had a right to assume that the money belonging to her and which never had been in her possession was placed by the trust company in its trust department, and there kept in accordance with the terms of the statutes. Therefore she is not barred by the wrongful acts of the company or its officers or agents. Barkas v. Commissioner of Banks, 254 Mass. 451, 150 N. E. 178."

The general doctrine upon which these decisions are based is stated in 3 R. C. L. § 47 as follows:

"If, however, a banking corporation receives the property of a person under an express contract, though ultra vires, to return the same, it cannot avoid the duty to do so, on the ground that the contract was ultra vires. It may have had no legal power to take the steps by which the money or property of third persons came into its hands, but, having taken such steps and obtained their money or property, no such absurdity exists as a legal obstacle to its surrendering it. It would be a reproach to the law to hold any such doctrine of inequity. And this rule is fully applicable to national banks."

Consequently, in view of the fact that the bank has received the trust moneys, has converted them and has failed to account for them, plaintiff is entitled to payment out of the deposit made with the state for the protection of trust beneficiaries.

Nor could the old bank, in this situation, transfer to the new bank any right superior to that of the plaintiffs. The fund was created for their protection, and no sale of the same in fraud of their rights could be recognized. Furthermore, this court has previously rightfully directed that the proceeds of sale of the bonds should be held subject to the rights of plaintiff, until same shall have been determined. Taylor v. Spurway (C. C. A.) 72 F.(2d) 97.

I conclude, therefore, that plaintiffs should have a decree as prayed. Proper form may be submitted.